**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

GREGORY PAUL SHERMAN,

      Plaintiff,

      vs.                                  Civ. No. 18-439 KK

NANCY A. BERRYHILL, Acting Commissioner
of the Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Gregory Paul Sherman's ("Mr. Sherman")

Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 18)

("Motion"), filed September 28, 2018, seeking review of the decision of Defendant Nancy A.

Berryhill, Acting Commissioner of the Social Security Administration ("Commissioner") denying

Mr. Sherman's claim for Title II disability insurance benefits and Title XVI supplemental security

income benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3).  The Commissioner filed a response

in opposition to the Motion on November 15, 2018, (Doc. 19), and Mr. Sherman filed a reply in

support of the Motion on December 21, 2018.  (Doc. 21.)  Having meticulously reviewed the entire

record and the applicable law and being otherwise fully advised in the premises, the Court FINDS

that Mr. Sherman's Motion is well taken and should be GRANTED.

## I.  Legal Standards

### A.    Standard of Review

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case.  (Doc. 9.)

This Court must affirm the Commissioner's final decision denying social security benefits unless: (1) "substantial evidence" does not support the decision; or, (2) the Administrative Law Judge ("ALJ") did not apply the correct legal standards in reaching the decision.[2] 42 U.S.C. §§ 405(g), 1383(c)(3); *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). The Court must meticulously review the entire record but may "neither reweigh the evidence nor substitute [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008); *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* Although the Court may not re-weigh the evidence or try the issues *de novo*, its consideration of the record must include "anything that may undercut or detract from the [agency]'s findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the agency's] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Thus, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the ALJ . . . must discuss the

---

[2] Judicial review is limited to the Commissioner's final decision, which is generally the ALJ's decision. *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1155 n.1 (D.N.M. 2016). "This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision." *Id.*

uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

**B.      Disability Determination Process**

A person must, *inter alia*, be "under a disability" to qualify for disability insurance benefits under Title II; similarly, a "disabled" person may qualify for supplemental security income benefits under Title XVI.  42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1).  An individual is considered to be "under a disability" if he is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).

The Commissioner has adopted a five-step sequential analysis to determine whether a person satisfies the statutory criteria:

> (1)      At step one, the ALJ must determine whether the claimant is engaging in "substantial gainful activity."[3]  If the claimant is engaging in substantial gainful activity, he is not disabled regardless of his medical condition.

> (2)      At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment (or combination of impairments) that is severe and meets the duration requirement, he is not disabled.

> (3)      At step three, the ALJ must determine whether a claimant's impairment meets or equals in severity one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and meets the duration requirement.  If so, a claimant is presumed disabled.

> (4)      If none of the claimant's impairments meet or equal one of the listings, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  This step involves three phases.  *Winfrey v. Chater*, 92 F.3d

---

[3] "Substantial work activity is work activity that involves doing significant physical or mental activities."  20 C.F.R. §§ 404.1572(a), 416.972(a).  "[W]ork may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b), 416.972(b).

1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. Third, the ALJ must determine whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is able to perform his past relevant work is not disabled.

(5)    If the claimant is unable to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan*, 399 F.3d at 1261. The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step evaluation process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II.  Background and Procedural History

### A.    Factual Background

Mr. Sherman alleges that he became disabled on November 21, 2010 because of Bipolar Disorder, Attention Deficit Disorder, Anxiety Disorder (NOS) and Social Phobia. (Doc. 18 at 1,

AR 36, 224-230, 241, 542.)[4]  Mr. Sherman has a law degree and worked as an attorney from 1998 to 2003.  (AR 51-53, 283-90, 339.)  He worked as a telemarketer and a temporary worker between 2003 and 2006, and as a substitute teacher from 2006 to 2012.  (AR 38-39, 283-90, 337, 339.)  In 2016, he worked ten to fifteen hours per week as a legal assistant, and in 2017 he worked briefly at the New Mexico State Fair.  (AR 571-72.)  Mr. Sherman testified that two factors have prevented him from working on a more regular basis.  First, he testified that he always "end[s] up saying something that [he] shouldn't say," which often leads directly to the termination of his employment.[5]  (AR 572-73; *cf.* AR 45 ("[E]very job that I have done . . . from my job at the Public Defender Department onward . . . I managed to do something that has either got me fired or I've failed at the job so miserably I've been unable to continue with that.").)  Second, he testified that he has problems concentrating for several hours together on a consistent basis.  (AR 573.)

The earliest treatment notes in the record indicate that, by November 1, 2004, Mr. Sherman was an established patient at the Las Cruces Mental Health Center ("LCMHC").  (AR 375.)  He received mental health treatment at LCMHC two to eleven times per year through June 17, 2009,[6] by which date his providers had diagnosed him with bipolar disorder, ADD, and avoidant schizoid

---

[4] Citations to "AR" are to the transcript of the administrative record filed in this matter on July 20, 2018.  (Doc. 13.)

[5] For example, Mr. Sherman testified that he was asked to leave his job as a public defender, as well as three schools where he later substitute taught, for making inappropriate comments.  (AR 39-40, 51-52.)

[6] The record indicates that Mr. Sherman was seen at the LCMHC twice in 2004, eleven times in 2005, four times in 2006, three times in 2007, four times in 2008, and two times in 2009.  (AR 345-75.)

personality, and prescribed Depakote,[7] Ritalin,[8] Effexor,[9] and Abilify[10] to treat these disorders. (AR 345-75.)  In November 2009, Mr. Sherman changed treatment providers to the Southwest Counseling Center ("SWCC"), where he received mental health treatment approximately four times per year until July 2012.[11]  (AR 377-81, 415-17.)  By July 2012, his providers at the SWCC had diagnosed him with bipolar disorder and ADD, and prescribed Depakote, Dexedrine,[12] and Lexapro[13] to treat these disorders.  (AR 381, 393, 415-17.)  In her July 11, 2012 treatment plan review, Virginia Chavez, L.I.S.W., noted that Mr. Sherman no longer had a job in Las Cruces and would be moving to Albuquerque.  (AR 415.)

After moving to Albuquerque, Mr. Sherman sought treatment from Kevin Rexroad, M.D., a psychiatrist.  (AR 457-60, 830.)  The record indicates that Dr. Rexroad saw Mr. Sherman about twenty-three (23) times between August 2012 and November 2017.[14]  (AR 454-75, 489-98, 909-

---

[7] Depakote (valproic acid) is used, *inter alia*, "to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder."  https://medlineplus.gov/druginfo/meds/a682412.html (last visited Apr. 22, 2019).

[8] Ritalin (methylphenidate) is used, *inter alia*, "to control symptoms of attention deficit hyperactivity disorder . . . in adults and children."  https://medlineplus.gov/druginfo/meds/a682188.html (last visited Apr. 22, 2019).

[9] Effexor (venlafaxine) is used, *inter alia*, "to treat depression."  https://medlineplus.gov/druginfo/meds/a694020.html (last visited Apr. 22, 2019).

[10] Abilify (aripiprazole) is used, *inter alia*, "alone or with other medications to treat episodes of mania or mixed episodes (symptoms of mania and depression that happen together) in adults, teenagers, and children 10 years of age and older with bipolar disorder."  https://medlineplus.gov/druginfo/meds/a603012.html (last visited Apr. 22, 2019).

[11] The record indicates that Mr. Sherman was seen at the SWCC once in 2009, four times in 2010, four times in 2011, and three times in 2012.  (AR 415-17.)  In addition, SWCC providers prescribed psychiatric medications for Mr. Sherman approximately monthly.  (AR 377-81.)

[12] Dexedrine (dextroamphetamine) is used, *inter alia*, "to control symptoms of attention deficit hyperactivity disorder . . . in adults and children."  https://medlineplus.gov/druginfo/meds/a605027.html (last visited Apr. 22, 2019).

[13] Lexapro (escitalopram) is used, *inter alia*, "to treat depression and generalized anxiety disorder." https://medlineplus.gov/druginfo/meds/a603005.html (last visited Apr. 22, 2019).

[14] The record indicates that Dr. Rexroad saw Mr. Sherman three times in 2012 and four times every year thereafter through 2017.  (AR 454-75, 489-98, 909-26, 945-48.)  Mr. Sherman also sought psychiatric care at the University of New Mexico ("UNM") Psychiatric Center after moving to Albuquerque, "because of his reliance on the UNM Care assistance program for prescription costs."  (AR 830.)  Psychiatrist Dr. Caroline Bonham decided to "defer [Mr. Sherman's] primary psychiatric care to Dr. Rexroad and allow Dr. Rexroad to work with [Mr. Sherman's] primary

26, 945-48.) Dr. Rexroad originally diagnosed Mr. Sherman with unspecified episodic mood disorder, anxiety (rule out post-traumatic stress disorder and obsessive compulsive disorder), and rule out Asperger's syndrome.[15] (AR 460.) These diagnoses evolved over the years to become, by November 2017, bipolar I disorder and anxiety disorder not otherwise specified. (AR 945.) Dr. Rexroad also changed Mr. Sherman's prescription medications and dosages a number of times, originally prescribing Depakote ER 1000 milligrams per day, Venlafaxine 15 milligrams per day, and Dexedrine 10 milligrams per day as needed, and by November 2017 prescribing Depakote ER 1,000 milligrams per day, Venlafaxine 50 milligrams twice a day, and Bupropion[16] 75 milligrams twice a day. (AR 458, 460, 945.) Dr. Rexroad also referred Mr. Sherman to psychotherapy with various providers,[17] for a sleep study, and for an autism spectrum evaluation at the University of New Mexico Transdisciplinary Evaluation and Support Clinic ("TEASC") in October 2016. (AR

---

care provider" so that Mr. Sherman could "obtain medication as cheaply as possible." (AR 832.) Nevertheless, the ALJ appears to have reviewed the treatment notes of Mr. Sherman's primary care provider, Dr. Tasha Barnes, as if Mr. Sherman were individually his psychiatric care from her. (*Compare, e.g.*, AR 552 (According to the ALJ, Dr. Barnes "did not opine that [Mr. Sherman] had any mental health issues" in April 2016) *with* AR 859 (Dr. Barnes' treatment notes listed "bipolar disorder" as one of Mr. Sherman's "ongoing problems" in April 2016).)

[15] The record fails to support the ALJ's determination that Dr. Rexroad's "treatment notes do not indicate why" he "suddenly" added Asperger's syndrome to Mr. Sherman's diagnoses in 2013. (AR 542.) In his notes regarding his initial evaluation of Mr. Sherman on August 15, 2012, Dr. Rexroad included Asperger's syndrome as a rule-out diagnosis and, under the heading "Referrals," wrote "consider full [n]europsych[ological] [e]val[uation]." (AR 460.) In his notes regarding Mr. Sherman's next appointment on September 20, 2012, Dr. Rexroad wrote, "Refer to Philip Reed Psy.D. for evaluation of Asperger's Syndrome." (AR 456.) Mr. Sherman testified that he decided not to follow up on this referral for financial reasons. (AR 43.) Thus, on April 18, 2013, Dr. Rexroad instructed Mr. Sherman to perform a "Reading the Mind in Eyes" test "[t]o [r]ule-in (with more evidence) Asperger's Syndrome." (AR 474-75.) Dr. Rexroad also applied the "Diagnostic Criteria for 299.80 Asperger's Disorder" to Mr. Sherman, checking off sufficient criteria to establish a diagnosis. (AR 473.) Thus, in his notes regarding Mr. Sherman's next appointment on July 12, 2013, Dr. Rexroad began including Asperger's syndrome in Mr. Sherman's diagnoses. (AR 921.) Nevertheless, Dr. Rexroad again referred Mr. Sherman for a neuropsychological evaluation on May 13, 2016. (AR 912.) Dr. Rexroad continued to include Asperger's syndrome in Mr. Sherman's diagnoses until February 17, 2017, on which date he noted, "[a]utism [s]pectrum [disorder] – ruled out by [n]euro[psychological]." (AR 909-22.)

[16] Wellbutrin (bupropion) is used, *inter alia*, "to treat depression." https://medlineplus.gov/druginfo/meds/a695033.html (last visited Apr. 22, 2019).

[17] Mr. Sherman's psychotherapy providers during this time included William Chambreau, Liza Mermelstein, and Sondra Redwood. (AR 909-24, 945-48.)

454-75, 489-98, 880-85, 909-26, 945-48.)   At the TEASC evaluation, Drs. Richard Campbell, Cynthia King, and Toni Benton ruled out ASD, maintained Mr. Sherman's diagnosis of bipolar I disorder, and added a diagnosis of social anxiety disorder (social phobia).  (AR 884-85.)

Dr. Rexroad completed three "Medical Assessment[s] of Ability to do Work-Related Activities (Mental)" regarding Mr. Sherman, in April 2013, February 2014, and January 2018. (AR 468-69, 477-78, 940-41.)  Each of these forms indicated that Dr. Rexroad was to "consider the patient's medical history and the chronicity of findings as from a year prior to initial visit to current examination." (*Id.* (emphasis omitted).)  In April 2013, Dr. Rexroad assessed Mr. Sherman as having seven marked limitations, one marked to moderate limitation, and two moderate limitations in various work-related mental activities.  (AR 468-69.)  In February 2014, Dr. Rexroad assessed Mr. Sherman as having six marked and eight moderate limitations (AR 477-78); and, in January 2018, Dr. Rexroad assessed Mr. Sherman as having eight marked and six moderate limitations.  (AR 940-41.)

Paula Hughson, M.D., conducted a consultative psychiatric examination of Mr. Sherman on October 29, 2012.[18]  (AR 427-31.)  She assessed Mr. Sherman as "a rather textbook case of manic depressive illness, or Bipolar I Disorder," and found that "[t]his illness has had severe repercussions in his personal and professional life."  (AR 431.)  She noted that Mr. Sherman "would certainly benefit from more frequent contact with his psychiatrist" but that he was limiting his visits to Dr. Rexroad for financial reasons.  (*Id.*)  She further opined that Mr. Sherman

> should be encouraged to work with DVR towards hopefully finding some type of
> work, commensurate with his intelligence and level of education, but with minimal
> contact with the public.[19]  He is gravely affected by his chronic mental illness.  He

---

[18] The ALJ misidentified Dr. Hughson as "Paula Houghson, PhD."  (AR 547.)

[19] "DVR" refers to the New Mexico Division of Vocational Rehabilitation.  http://www.dvr.state.nm.us/ (last visited Apr. 30, 2019).  Substantial evidence does not support the ALJ's determination that, "despite State agency consultative examiner Dr. Houghson's [sic] advice that the claimant should work with DVR, the evidence of record lacks

could not be considered capable of fully supporting himself or being able to provide for the specialized mental health treatment which he will continue to require indefinitely.

(*Id.*) Dr. Hughson assessed Mr. Sherman as having one marked, one marked to moderate, and five moderate impairments in his ability to engage in various work-related mental activities. (AR 432.)

In November 2012, non-examining psychological consultant Jay Rankin, M.D., completed a Mental Residual Functional Capacity Assessment ("MRFCA") of Mr. Sherman on initial consideration of Mr. Sherman's March 2012 applications for social security benefits. (AR 86-88.) Non-examining psychological consultant Sheri L. Simon, Ph.D., concurred with Dr. Rankin's assessment on reconsideration in March 2013. (AR 102-04.) Drs. Rankin and Simon assessed Mr. Sherman as having eight moderate limitations in various work-related mental activities. (AR 86-88, 102-04.) Finally, in May 2017, non-examining psychological consultant Cathy Simutis, Ph.D., completed a MRFCA of Mr. Sherman on initial consideration of Mr. Sherman's April 2016 application for social security benefits. (AR 651-53.) Dr. Simutis assessed Mr. Sherman as having two moderate limitations in work-related mental activities. (*Id.*)

## B.      Procedural History

On March 9 and 26, 2012, Mr. Sherman protectively filed applications for disability insurance benefits under Title II, and supplemental security income benefits under Title XVI, of the Social Security Act, alleging an onset date of November 1, 2005. 42 U.S.C. §§ 401 *et seq.*; 42 U.S.C. §§ 1381 *et seq.*; (AR 66-67, 194-202.) The agency denied Mr. Sherman's applications at the initial level and upon reconsideration on November 28, 2012 and March 29, 2013, respectively.

---

information on him doing so." (AR 555.) For example, on July 12, 2013, Dr. Rexford noted that Mr. Sherman was "slowly thru therapy and DVR working towards possibly having a job," (AR 921); on August 26, 2014, Mr. Sherman testified that he "ha[s] a person [he] see[s] there a[t] DVR," (AR 45-46); and, on February 6, 2018, Mr. Sherman testified that he was signed up with DVR and they had gotten him the part-time legal assistant job he had in 2016. (AR 577-78.)

(AR 66-121.)  On May 30, 2013, Mr. Sherman requested a hearing before an ALJ.  (AR 136-38.)

ALJ Ann Farris conducted a hearing on August 26, 2014.  (AR 32-65.)  Mr. Sherman appeared in

person at the hearing with attorney representative Michael Armstrong and amended his alleged

onset date to November 21, 2010.  (*Id.*)  The ALJ took testimony from Mr. Sherman, his father

Martin Philip Sherman, and impartial vocational expert ("VE") Nicole King.  (*Id.*)  On October

22, 2014, the ALJ issued a decision finding Mr. Sherman not disabled.  (AR 16-26.)  The Appeals

Council upheld the ALJ's final decision on February 16, 2016.  (AR 1-3.)

On April 19, 2016, Mr. Sherman filed a complaint seeking judicial review of the

Commissioner's final decision.  (AR 620-21.)  This Court reversed the Commissioner's decision

and remanded the case for further proceedings on March 30, 2017.  (AR 622-36.)  While the case

was still pending before this Court, on April 25, 2016, Mr. Sherman filed a second application for

disability insurance benefits under Title II, alleging an onset date of May 1, 2013.  (AR 642, 644.)

The agency denied this application at the initial level on May 26, 2017.  (AR 642-55.)  On June

23, 2017, the Appeals Council ordered the ALJ to consolidate Mr. Sherman's applications, create

a single record, offer Mr. Sherman another administrative hearing, take any further action to

complete the administrative record, and issue a new decision.  (AR 639-40.)

Pursuant to the Appeals Council's instructions, ALJ Farris conducted another

administrative hearing on February 6, 2018.  (AR 566-94.)  Mr. Sherman appeared in person at

the hearing with attorney representative William Rode.  (*Id.*)  The ALJ took testimony from

Mr. Sherman and impartial VE Pamela (or Cindy A.) Harris.[20]  (*Id.*)  ALJ Farris issued a second

decision finding Mr. Sherman not disabled on March 8, 2018.  (AR 538-58.)  This appeal followed.

_____

[20] The transcript of the February 6, 2018 hearing identified the VE who testified at the hearing as Pamela Harris.  (AR 566, 568, 589.)  However, in her decision, the ALJ identified the VE as Cindy A. Harris.  (AR 538.)

C.     **The ALJ's Decision**

In her March 8, 2018 decision, ALJ Farris determined at step one of the sequential evaluation process that Mr. Sherman worked after his amended alleged onset date, but that his work did not rise to the level of substantial gainful activity.[21]  (AR 541.)  At step two, the ALJ found that Mr. Sherman has the severe impairments of:  (1) bipolar disorder; (2) attention deficit disorder ("ADD"); (3) anxiety disorder not otherwise specified; and, (4) social phobia.  (AR 542.)  The ALJ also found that Mr. Sherman has the nonsevere impairments of hyperlipidemia, hypertension, and obstructive sleep apnea.  (*Id.*)  Further, she rejected Mr. Sherman's allegation that he has Asperger's syndrome, based on a 2016 autism spectrum evaluation that ruled out a diagnosis of autism spectrum disorder ("ASD") in favor of social anxiety disorder (social phobia).  (AR 542, 879-85.)

The ALJ determined at step three that Mr. Sherman's impairments do not meet or medically equal the severity of one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  (AR 543-44.)  As a result, the ALJ proceeded to step four and found that Mr. Sherman has the RFC to perform a full range of work at all exertional levels but is "limited to work involving simple and some detailed, but not complex, tasks" and requiring only "occasional and superficial interaction with the public and with coworkers."  (AR 544, 556.)  Also at step four, the ALJ concluded that Mr. Sherman is unable to perform any of his past relevant work.  (AR 556-57.)  However, at step five, the ALJ determined that Mr. Sherman is not disabled because, based on his RFC, age, education, and work experience and the VE's testimony, there are jobs that exist in significant numbers in the national economy that Mr. Sherman can perform.  (AR 557-58.)

---

[21] The ALJ made this determination because she found that Mr. Sherman's earnings fell below the annual regulatory limits for the years in which he earned income.  (AR 541.)

### III. <u>Analysis</u>

In support of his Motion, Mr. Sherman argues that: (1) the ALJ failed to provide adequate reasons for rejecting the medical opinions of Mr. Sherman's treating psychiatrist, Dr. Rexroad; and, (2) in formulating Mr. Sherman's RFC, the ALJ erroneously failed to account for several functional limitations listed in the medical opinions of Drs. Hughson, Rankin, and Simon. (Doc. 18 at 1, 26.) For the reasons discussed below, the Court finds that the ALJ failed to provide adequate reasons for the weight she assigned to two of Dr. Rexroad's medical opinions, and, in formulating Mr. Sherman's RFC, she failed to account for an uncontroverted functional limitation identified in the medical source opinions of record. The Court further concludes that these errors were not harmless. As such, this case requires remand.

**A.     The ALJ did not provide adequate reasons for the weight she assigned to Dr. Rexroad's February 2014 and January 2018 medical opinions.**

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."[22] *Hamlin*, 365 F.3d at 1215 (citation omitted). When the opinion at issue is that of the claimant's treating physician, the ALJ must first consider "whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record." *Allman v. Colvin*, 813 F.3d 1326, 1331–32 (10th Cir. 2016) (quoting *Pisciotta v. Astrue,* 500 F.3d 1074, 1077 (10th Cir. 2007)). "If so, the ALJ must give the opinion controlling weight."[23] *Id.*

---

[22] As the Commissioner observes, the agency has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); (Doc. 19 at 4 n.3.) However, the parties agree that, because Plaintiff filed his claims in 2012 and 2016, the previous regulations still apply to this matter. (AR 66-67, 194-202, 642.)

[23] "A physician's opinion is deemed entitled to special weight as that of a 'treating source' when he has seen the claimant a number of times and long enough to have obtained a longitudinal picture of the claimant's impairment,

Moreover, even if a treating physician's medical opinion is not entitled to controlling weight, it is "still entitled to deference" and the ALJ must decide what weight, if any, to give it. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004). Relevant factors the ALJ should consider are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Allman*, 813 F.3d at 1331-32; *Oldham*, 509 F.3d at 1258; *Robinson*, 366 F.3d at 1082; *Watkins v. Barnhart,* 350 F.3d 1297, 1301 (10th Cir. 2003).

Although she need not specifically address each of the above factors, "an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion." *Allman*, 813 F.3d at 1332; *Oldham*, 509 F.3d at 1258; *Langley,* 373 F.3d at 1119. These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Allman*, 813 F.3d at 1332; *Oldham*, 509 F.3d at 1258; *Langley*, 373 F.3d at 1119. Moreover, "[i]f the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Allman*, 813 F.3d at 1332; *Langley*, 373 F.3d at 1119.

> In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.

---

taking into consideration the treatment the source has provided and the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003) (quotation marks and brackets omitted).

*Langley*, 373 F.3d at 1121 (emphasis omitted) (quoting *McGoffin v. Barnhart,* 288 F.3d 1248, 1252 (10th Cir. 2002)); *Robinson*, 366 F.3d at 1082 (same).

> In addition,
>
> when a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around. The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[24]

*Hamlin*, 365 F.3d at 1215 (citations and quotation marks omitted); *Robinson*, 366 F.3d at 1084 (same).

Here, the ALJ found, and the Commissioner does not dispute, that Dr. Rexroad was Mr. Sherman's treating psychiatrist from August 2012 through at least November 2017. (AR 546-52, 555; Doc. 19 at 5.) The ALJ stated that she gave "[s]ome weight" to "Dr. Rexroad's opinions." (AR 555.) She explained that she did not give more weight to his April 2013 opinion for two reasons. (*Id.*) First, she stated that it was "inconsistent with his objective treatment records, which indicate that he only saw the claimant approximately every 3 months, that he rarely made medication changes and in which he opined repeatedly that the claimant was stable." (AR 555.) Second, the ALJ observed that Dr. Rexroad "stated that the claimant's primary impairment was 'undiagnosed' Asperger's syndrome, which he later removed as a diagnosis for the claimant after an evaluation by Dr. Campbell, Dr. Benton and Dr. King." (*Id.*)

The ALJ explained that she did not give more weight to Dr. Rexroad's February 2014 opinion because

---

[24] "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson*, 366 F.3d at 1084.

the marked limitations he opined that the claimant had are inconsistent with his treatment notes, in which he opined that the claimant's condition was stable, and with the claimant's own reports that he spent time with friends, played games and read as a hobby.

(AR 555-56.) The ALJ offered no explanation for why she gave only some weight to Dr. Rexroad's January 2018 opinion regarding Mr. Sherman's work-related mental limitations.[25] (*See* AR 553, 555-56.)

The Court first notes that the ALJ failed to follow the treating physician rule because she did not discuss whether Dr. Rexroad's opinions were entitled to controlling weight. Instead, she "collapsed the two-step inquiry into a single point, stating only" the weight she gave the opinions and, with respect to the April 2013 and February 2014 opinions, the reasons why. *Chrismon v. Colvin*, 531 F. App'x 893, 901 (10th Cir. 2013).[26] However, the Tenth Circuit has declined to reverse on this ground where "the ALJ implicitly declined to give . . . controlling weight" to a treating source's opinion. *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014). Accordingly, the Court will review the reasons the ALJ provided for the weight she assigned to Dr. Rexroad's opinions. *See Langley*, 373 F.3d at 1120-23; *Chrismon*, 531 F. App'x at 901.

The Court finds that the ALJ provided an adequate reason for the weight she assigned to Dr. Rexroad's April 2013 opinion, but not for the weight she assigned to his February 2014 and January 2018 opinions. Regarding Dr. Rexroad's April 2013 opinion, substantial evidence does not support the ALJ's conclusion that the opinion is "inconsistent with his objective treatment records" because "he only saw the claimant approximately every 3 months, . . . rarely made

---

[25] The ALJ also noted that Dr. Rexroad completed forms assessing whether Mr. Sherman met listings 12.04 and 12.06 in April 2013, February 2014, and January 2018. (AR 548-50, 553.) Although some of the explanations the ALJ offered for the "little" or "no" weight she assigned to these forms are dubious, Mr. Sherman has not challenged them, and the Court will therefore not address them. (*Id.*; *see generally* Doc. 18.)

[26] In the Tenth Circuit, unpublished decisions are not binding precedent but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

medication changes and . . . opined repeatedly that the claimant was stable." (AR 555.) Dr. Rexroad's treatment records actually show that, between August 15, 2012 and April 18, 2013, he saw Mr. Sherman for at least an hour every two months on average, made three medication changes, and never described Mr. Sherman's condition as "stable."[27] (AR 454-60, 923-26.) In addition, the ALJ "may not discredit [the claimant] for a lack of treatment or aggressive testing when . . . [he] has a legitimate reason for [failing] to get additional treatment, such as lack of funds." *Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004). Here, the record evidence indicates that a lack of funds prevented Mr. Sherman from seeing Dr. Rexroad more frequently. (AR 431.)

Nevertheless, substantial record evidence supports the ALJ's decision to give reduced weight to Dr. Rexroad's April 2013 opinion because there is evidence that he formed it in reliance on the mistaken belief that Mr. Sherman had Asperger's syndrome. (AR 468-69.) In his April 2013 assessment, Dr. Rexroad wrote that he was "convinced p[atient] has Bipolar Affective [Disorder] but Asperger's Syndrome is his primary (and original but undiagnosed) condition." (AR 468.) Further, although Dr. Rexroad did not explicitly link his conviction that Mr. Sherman had Asperger's syndrome to his assessment of Mr. Sherman's work-related mental limitations, his notation of this conviction in the body of the assessment permits the inference of a connection between them.

Then, Dr. Rexroad's conviction that Mr. Sherman had Asperger's syndrome is inconsistent with the TEASC autism spectrum evaluation of Mr. Sherman in October 2016. (AR 880-85.)

---

[27] In his treatment notes regarding Mr. Sherman, Dr. Rexroad did not use a form of the word "stable" to describe Mr. Sherman's condition until February 9, 2015. From that date, he did so on four occasions: February 9, 2015 ("maintaining relative stability . . . Negative/pessimistic thoughts pervade") (AR 917); November 6, 2015 ("still battling lack of drive and willpower – and mood remains relatively stable. [His ability to work seems doubtful.]") (AR 914); November 11, 2016 ("essentially unchanged but maintaining a stable mood") (AR 910); and, May 5, 2017 ("maintaining relative stability but still not able to achieve gainful employment") (AR 947).

Specifically, in the TEASC evaluation, Drs. Campbell, Benton, and King concluded that Mr. Sherman's "presentation is not entirely consistent with a diagnosis of Autism Spectrum Disorder (ASD)."[28] (AR 884.) Moreover, substantial evidence supports the ALJ's conclusion that the TEASC evaluation outweighs Dr. Rexroad's conviction. *Hamlin*, 365 F.3d at 1215. Dr. Rexroad himself recognized the greater expertise of Drs. Campbell, Benton, and King in diagnosing ASD by referring Mr. Sherman to them for the evaluation, and by removing Asperger's syndrome from Mr. Sherman's diagnoses based on their report. (AR 880, 945-48.)

In his Motion, Mr. Sherman argues that "Asperger's syndrome was a valid diagnosis in 2013, when Dr. Rexroad provided his opinion," because the TEASC evaluation did not rule it out until 2016. (Doc. 18 at 20-21.) However, the TEASC evaluation's extensive reliance on Mr. Sherman's entire life history and his behaviors from birth through adulthood supports the inference that, if Mr. Sherman had ever actually had Asperger's syndrome, he would not have ceased to have it between April 2013 and October 2016. (AR 880-85); *see also* Am. Psychiatric Ass'n, "What Is Autism Spectrum Disorder?," https://www.psychiatry.org/patients-families/autism/what-is-autism-spectrum-disorder (last visited May 2, 2019) (ASD "is a lifelong condition"). The Court therefore finds that the inconsistency between Dr. Rexroad's stated conviction that Mr. Sherman had Asperger's syndrome and Mr. Sherman's autism spectrum evaluation is an adequate reason for the reduced weight the ALJ gave to Dr. Rexroad's April 2013 assessment.

---

[28] ASD includes Asperger's syndrome. https://www.mayoclinic.org/diseases-conditions/autism-spectrum-disorder/symptoms-causes/syc-20352928 (last visited May 2, 2019); https://www.nimh.nih.gov/health/topics/autism-spectrum-disorders-asd/index.shtml (last visited May 2, 2019).

The ALJ's proffered reasons for the weight she assigned to Dr. Rexroad's February 2014 opinion, however, are inadequate. In his February 2014 opinion, Dr. Rexroad opined that Mr. Sherman had "[m]arked" limitations in the following work-related mental activities[29]:

- Understand and remember detailed instructions;
- Carry out detailed instructions;
- Maintain attention and concentration for extended periods of time (i.e. 2-hour[] segments);
- Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance;
- Complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pac[e] without unreasonable number and length of rest periods; and,
- Set realistic goals or make plans independently of others.

(AR 477-78.) Dr. Rexroad further found that Mr. Sherman had "[m]oderate" limitations in the following work-related mental activities[30]:

- Remember locations and work-like procedures;
- Sustain an ordinary routine without special supervision;
- Work in coordination with/or proximity to others without being distracted by them;
- Interact appropriately with the general public;
- Accept instructions and respond appropriately to criticism from supervisors;
- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and,
- Respond appropriately to changes in the work place.

(*Id.*) As noted above, the ALJ explained that she gave reduced weight to Dr. Rexroad's February 2014 opinion because the marked limitations Dr. Rexroad found were "inconsistent" with his

---

[29] A "[m]arked" limitation was defined as "[a] severe limitation which **precludes** the individual's ability usefully to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule. The individual cannot be expected to function inde[pend]ently, appropriately and effectively on a regular and sustained basis." (AR 477-78 (emphasis in original).)

[30] A "[m]oderate" limitation was defined as "[a] limitation that **seriously interferes** with the individual's ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule. The individual may be able to perform this work-related mental function on a limited basis. However, the individual should not be placed in a job setting where this mental function is critical to job performance or to job purpose." (AR 477-78 (emphasis in original).)

treatment notes, "in which he opined that the claimant's condition was stable, and with the claimant's own reports that he spent time with friends, played games and read as a hobby." (AR 555-56.)

Regarding the ALJ's first point, Dr. Rexroad did not use the word "stable" to describe Mr. Sherman's condition between August 15, 2012 and February 7, 2014. (AR 454-60, 490-93.) Moreover, to the extent that Dr. Rexroad's treatment records reflect that Mr. Sherman's condition was "stable," they do so only in the sense of documenting that his condition remained the same. *Cf. Robinson*, 366 F.3d at 1083 (treating physician's "references to claimant being 'stable' may have simply meant that she was not suicidal"). For example, during this time period, Dr. Rexroad consistently noted that Mr. Sherman's mood was "depressed" and "anxious," his affect was "constricted," and his GAF scores were 40-45.[31] (AR 454-60, 490-93.) Likewise, Dr. Rexroad nearly always documented that Mr. Sherman's mental state was negative. Thus, according to Dr. Rexroad's notes, in August 2012, Mr. Sherman was "fearful for his own future," (AR 457); in September 2012, he felt "pretty hopeless of getting a job," (AR 456); in November 2012, he felt "despair about finding employment" and "more depressed," (AR 455); in January 2013, he was "in limbo" and "battling low self-esteem," (AR 454); in April 2013, he "continu[ed] to isolate to home and be unproductive," felt "isolated and alone," and lacked "skills to change" (AR 493); and, in October 2013, he experienced increased anhedonia. (AR 491.) Thus, the record evidence entirely fails to support the ALJ's conclusion that Dr. Rexroad's February 2014 opinion is inconsistent with his treatment records regarding Mr. Sherman. *See Langley*, 373 F.3d at 1118 (a

---

[31] "The GAF is a 100–point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record").

Likewise, the record evidence does not support the ALJ's conclusion that Dr. Rexroad's February 2014 opinion is inconsistent with Mr. Sherman's "own reports that he spent time with friends, played games and read as a hobby." (AR 555-56.) Spending time with friends, playing games, and reading as a hobby do not in themselves preclude the work-related limitations Dr. Rexroad attributed to Mr. Sherman in February 2014. *See, e.g., Williams v. Bowen*, 844 F.2d 748, 759 (10th Cir. 1988) ("limited activities in themselves do not establish that one can engage in light or sedentary work"); *Talbot v. Heckler,* 814 F.2d 1456, 1462 (10th Cir. 1987) (short-term work projects and intermittent driving were not equivalent to gainful activity); *Broadbent v. Harris,* 698 F.2d 407, 413 (10th Cir. 1983) (yard work, household tasks, car repairs, and occasional car trips are not considered reasonably regular or prolonged activity); *Anaya v. Berryhill*, No. 1:17-CV-00826-LF, 2019 WL 1324957, at *7 (D.N.M. Mar. 25, 2019) ("[a]bsent a function-by-function analysis," regular church attendance, caring for daughter and pets, and yard work did not support ALJ's conclusion that claimant was able to do light work); *Parraz v. Berryhill*, No. CV 17-143 KK, 2018 WL 2357275, at *10 (D.N.M. May 24, 2018) ("ALJ's reliance on sporadic and intermittent performance of daily activities to establish that a claimant is capable of engaging in substantial gainful activity is insufficient when a claimant's medical complaints are supported by substantial evidence"). Moreover, the ALJ did not explain what, if anything, about Mr. Sherman's participation in these activities was inconsistent with the work-related limitations to which Dr. Rexroad opined.[32] The ALJ therefore failed to supply an adequate reason for giving reduced

---

[32] The ALJ did, in rejecting Mr. Chambreau's opinion, state that Mr. Sherman had "a high level of engagement in daily activities." (AR 556.) In so finding, however, the ALJ did not acknowledge or account for the record evidence that Mr. Sherman's engagement in daily activities varied significantly from day to day and was frequently severely limited by his mental impairments. (*See, e.g.*, AR 45 (Mr. Sherman testified that if he did things for "say, six hours"

weight to Dr. Rexroad's February 2014 opinion regarding Mr. Sherman's work-related limitations. *See Langley*, 373 F.3d at 1123 (ALJ's reasons for rejecting treating physician's opinion were inadequate where ALJ failed to explain or identify claimed inconsistencies between treating physician's opinion and other substantial evidence in the record).

Finally, the ALJ provided no reason at all for rejecting Dr. Rexroad's January 2018 opinion regarding Mr. Sherman's work-related mental limitations. In his January 2018 assessment, Dr. Rexroad found that Mr. Sherman had marked limitations in the following work-related mental activities:

- Understand and remember detailed instructions;
- Carry out detailed instructions;
- Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance;
- Sustain an ordinary routine without special supervision;
- Work in coordination with/or proximity to others without being distracted by them;
- Complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pac[e] without unreasonable number and length of rest periods;
- Accept instructions and respond appropriately to criticism from supervisors; and,
- Set realistic goals or make plans independently of others.

(AR 940-41.) Dr. Rexroad further found that Mr. Sherman had moderate limitations in the following work-related mental activities:

- Remember locations and work-like procedures;
- Maintain attention and concentration for extended periods of time (i.e. 2-hour[] segments);
- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;
- Respond appropriately to changes in the work place; and,
- Be aware of normal hazards and take adequate precautions.

one day, he would be "recovering from that" the next day); AR 429 (Dr. Hughson noted that Mr. Sherman has "an erratic sleep pattern[, e]ither not being able to sleep during manic episodes, or hypersomnolent, when depressed").)

(*Id.*)  The ALJ described Dr. Rexroad's January 2018 assessment of Mr. Sherman's functional limitations in her decision but offered no explanation for why she gave it only "some weight." (AR 553, 555-56.)

The Court notes that the ALJ did not discuss, among other things, the length and nature of Dr. Rexroad's treatment relationship with Mr. Sherman, the kinds of examination and testing he ordered or performed, or whether the treatment he provided was within his specialty.  *Allman*, 813 F.3d at 1332; *Robinson*, 366 F.3d at 1082; *Watkins,* 350 F.3d at 1301.  This is so despite the fact that the Court, in its March 30, 2017 Memorandum Opinion and Order reversing the ALJ's first decision, found error because the ALJ "did not discuss the length of the treatment relationship, the nature and extent of the treatment relationship, or whether or not Dr. Rexroad's treatment was within his specialty."  (AR 632.)  The ALJ's failure to provide any reason for the weight she assigned to Dr. Rexroad's January 2018 opinion is clear error.  *See Allman*, 813 F.3d at 1332 ("[A]n ALJ must give good reasons ... for the weight assigned to a treating physician's opinion."); *Watkins*, 350 F.3d at 1301 ("[W]e cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned to the treating physician's opinion.").

In defense of the ALJ's treatment of Dr. Rexroad's opinions regarding Mr. Sherman's functional limitations, the Commissioner points to the ALJ's observation that Dr. Rexroad expressed his opinions via forms that

> appear[] to have been created by the claimant's representatives and ha[ve] preprinted on [them] that Dr. Rexroad was opining to the claimant's condition 'from one year prior to initial visit to current examination' while th[ese] form[s] also ha[ve] preprinted checkboxes on [them] that have 'Slight' as the least amount of limitation Dr. Rexroad could opine the claimant had.[33]

---

[33] The forms defined a "[s]light" limitation as "[n]o significant limitation in this area."  (AR 468-69, 477-78, 940-41.)

(AR 553; *see also* AR 548-49.)  The Commissioner cites to *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987), for the proposition that "check-the-box style evaluation forms, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence."  (Doc. 19 at 8.)

There are at least two problems with the Commissioner's argument.  First, though the ALJ did describe the format of Dr. Rexroad's opinions as the Commissioner claims, she did not rely on that format to explain the weight she assigned to Dr. Rexroad's opinions; and, the Court may not adopt *post hoc* rationalizations to justify the ALJ's decision.  *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007).  Second, if the ALJ did reduce the weight she gave Dr. Rexroad's opinions based on their format, it was error for her to do so.  As the Tenth Circuit has noted, *Frey*

> dealt with a nontreating physician's checkmarks on the agency's RFC form based on the most limited sort of contact and examination.  There was no indication of careful study of the claimant's history or prior examinations; the report even misstates the claimant's name.

*Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (quotation marks and brackets omitted).

Here, in contrast, the record includes not only Dr. Rexroad's three assessments of Mr. Sherman's functional limitations, but also reports regarding his psychiatric evaluation and treatment of Mr. Sherman over more than five years, including about twenty-three office visits, consecutive prescriptions for psychiatric medication, and referrals for counseling, an autism spectrum evaluation, and other medical treatment.  (AR 454-60, 468-98, 909-26, 940-48.)  Thus, the record indicates that Dr. Rexroad had extensive contact with Mr. Sherman and ample information regarding his impairments when he assessed Mr. Sherman's functional limitations; and, the format he used to express his opinions cannot justify the reduced weight the ALJ gave them.  *Carpenter*, 537 F.3d at 1267; *see also Andersen v. Astrue*, 319 F. App'x 712, 723 (10th Cir. 2009) (declining to "expand *Frey's* exclusion of check-box forms beyond those completed by nontreating physicians").  In sum, the Court finds that the ALJ erred because substantial evidence

does not support her stated reasons for the weight she assigned to Dr. Rexroad's February 2014 opinion regarding Mr. Sherman's functional limitations; and, she failed to provide any reason for the weight she gave to Dr. Rexroad's January 2018 opinion.

The Court further finds that these errors are not harmless. The Tenth Circuit applies "harmless error analysis cautiously in the administrative review setting." *Fischer-Ross*, 431 F.3d at 733. Nevertheless, harmless error analysis may be appropriate where the Court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.* at 733-34. Here, the Court finds that a reasonable administrative factfinder, following the correct analysis, could have given Dr. Rexroad's February 2014 and January 2018 opinions great or controlling weight, which would have resulted in a more restrictive RFC and possibly a finding of disability.

The Commissioner argues that the ALJ's treatment of Dr. Rexroad's opinions did not prejudice Mr. Sherman because the ALJ took the functional limitations Dr. Rexroad identified into account "by restricting [Mr. Sherman], who has a college degree, to work involving simple and some detailed, but not complex tasks; and occasional and superficial interaction with the public and with co-workers." (Doc. 19 at 9.) The Commissioner is correct that "an administrative law judge can account for *moderate* limitations by limiting the claimant to particular kinds of work activity." *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016) (emphasis added). Here, however, the ALJ's RFC failed to account for all of the *moderate and marked* limitations Dr. Rexroad identified in his February 2014 and January 2018 opinions.

The agency's Program Operations Manual System ("POMS") lists the mental abilities needed for "[a]ny [j]ob," including unskilled work.[34] SSA – POMS: DI 25020.010 (Apr. 5, 2007). In his February 2014 assessment, Dr. Rexroad opined that Mr. Sherman had marked limitations in two of these mental abilities, namely:

- The ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure); and,
- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

*Id.*; (*see* AR 477-78). Likewise, in his January 2018 assessment, Dr. Rexroad opined that Mr. Sherman had marked limitations in five of these mental abilities, specifically:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- The ability to sustain an ordinary routine without special supervision;
- The ability to work in coordination with or proximity to others without being (unduly) distracted by them;
- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and,
- The ability to accept instructions and respond appropriately to criticism from supervisors.

SSA – POMS: DI 25020.010 (Apr. 5, 2007); (*see* AR 940-41.)

In sum, in his February 2014 and January 2018 opinions, Dr. Rexroad found that Mr. Sherman had impairments in several of the mental abilities needed for *any* work, which necessarily includes "work involving simple and some detailed, but not complex tasks" and "occasional and

---

[34] The POMS "is a set of policies issued by the SSA to be used in processing claims." *Ramey v. Reinertson*, 268 F.3d 955, 964 (10th Cir. 2001) (quotation marks omitted). The Court must defer to POMS provisions unless it determines they are "arbitrary, capricious, or contrary to law." *Id.* at 964 n.2.

superficial interaction with the public and with co-workers." (AR 477-78, 544, 940-41.)
Moreover, Dr. Rexroad opined that these impairments were sufficiently severe that they *precluded*
Mr. Sherman from "usefully . . . perform[ing] the designated activit[ies] on a regular and sustained
basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule." (AR 477-78, 940-41.)
Contrary to the Commissioner's position, the ALJ clearly failed to account for these marked
limitations in formulating Mr. Sherman's RFC. Thus, her failure to apply the proper standards in
weighing Dr. Rexroad's opinions prejudiced Mr. Sherman and requires remand.

**B.** **In formulating Mr. Sherman's RFC, the ALJ failed to account for an uncontroverted functional limitation in the medical source opinions of record.**

"Although ALJs need not discuss every piece of evidence, they are required to discuss the
weight assigned to each medical source opinion." *Silva*, 203 F. Supp. 3d at 1157; *see Keyes-
Zachary*, 695 F.3d at 1161 (ALJ must "give consideration to" and "discuss the weight he assigns"
to "all the medical opinions in the record"); SSR 96-5P (S.S.A.), 1996 WL 374183, at *5 (1996)
("Adjudicators must weigh medical source statements . . . , providing appropriate explanations for
accepting or rejecting such opinions."). In particular, "when assessing a plaintiff's RFC, an ALJ
must explain what weight is assigned to each opinion and why." *Silva*, 203 F. Supp. 3d at 1157;
*see also* SSR 96-6P (S.S.A.), 1996 WL 374180, at *4 (1996) (ALJ "must consider and evaluate
any assessment of the individual's RFC by a State agency medical or psychological consultant and
by other program physicians or psychologists.").

> [T]here is no requirement in the regulations for a direct correspondence between an
> RFC finding and a specific medical opinion on the functional capacity in question.
> The ALJ, not a physician, is charged with determining a claimant's RFC from the
> medical record.

*Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (quotation marks and brackets omitted).
Nevertheless, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical

opinion, taking only the parts that are favorable to a finding of nondisability." *Haga*, 482 F.3d at

1208; *Robinson*, 366 F.3d at 1083 (same); *Hamlin*, 365 F.3d at 1219 (same).

The record reflects that Drs. Rexroad, Hughson,[35] Rankin, and Simon all found Mr.

Sherman to be *at least* moderately impaired in three mental abilities that the POMS lists as

"critical" for unskilled work, *i.e.*, the abilities to: (1) accept instructions and respond appropriately

to criticism from supervisors[36]; (2) get along with coworkers or peers without distracting them or

exhibiting behavioral extremes[37]; and, (3) respond appropriately to changes in a work setting.[38], [39]

(AR 86-88, 432, 468-69, 477-78, 940-41); SSA – POMS: DI 25020.010(B)(3). In her decision,

the ALJ accounted for a moderately impaired ability to get along with coworkers or peers without

distracting them or exhibiting behavioral extremes, by limiting Mr. Sherman to "occasional and

---

[35] The ALJ gave only "some weight" to Dr. Hughson's opinion. (AR 547-48.) By way of explanation, the ALJ wrote that Dr. Hughson's "conclusion that the claimant was incapable of supporting himself is inconsistent with her recommendation that he work with DVR in finding appropriate work." (*Id.*) Substantial evidence does not support the ALJ's explanation, which mischaracterizes Dr. Hughson's opinion. Specifically, Dr. Hughson did not conclude that Mr. Sherman was incapable of working or otherwise supporting himself *at all*; rather, she concluded that he was not "capable of *fully* supporting himself or being able to provide for the specialized mental health treatment which he will continue to require indefinitely." (AR 803 (emphasis added).) There is nothing inconsistent about concluding that Mr. Sherman would benefit from "hopefully finding some type of" appropriate work but is incapable of "fully supporting himself" by that work. In this regard, it is worth noting that Mr. Sherman did in fact find part-time, sporadic work, but did not earn enough to have engaged in substantial gainful activity. (AR 45-46, 541, 577-78, 921.)

[36] Dr. Hughson's form referred to this mental ability as the "[a]bility to interact with supervisors." (AR 432.) Dr. Rexroad in April 2013 and January 2018 found Mr. Sherman to be markedly impaired in this ability. (AR 468-69, 940-41.) Dr. Rexroad in February 2014, and Drs. Hughson, Rankin, and Simon, found Mr. Sherman to be moderately impaired in this ability. (*Id.*; AR 86-88, 432, 477-78.)

[37] Dr. Hughson's form referred to this mental ability as the "[a]bility to interact with coworkers." (AR 432.) Dr. Rexroad in April 2013 found Mr. Sherman to be markedly impaired in this ability. (AR 468-69.) Dr. Rexroad in February 2014 and January 2018, and Drs. Hughson, Rankin, and Simon, found Mr. Sherman to be moderately impaired in this ability. (*Id.*; AR 86-88, 432, 477-78, 940-41.)

[38] Dr. Hughson's form referred to this mental ability as the "[a]bility to adapt to changes in the workplace." (AR 432.) Drs. Rexroad, Hughson, Rankin, and Simon all found Mr. Sherman to be moderately impaired in this ability. (AR 86-88, 432, 468-69, 477-78, 940-41.)

[39] Dr. Simutis also found that Mr. Sherman was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors; however, she found that he was not significantly limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or in his ability to respond appropriately to changes in a work setting. (AR 651-53.)

superficial" interaction with coworkers. (AR 556); *Smith*, 821 F.3d at 1269. Also, the ALJ may have intended to account for Mr. Sherman's moderately impaired ability to respond appropriately to changes in the workplace by limiting Mr. Sherman to simple and detailed, but not complex tasks, though she did not expressly indicate that intent.[40] (AR 556); *see Chapo*, 682 F.3d at 1288 ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."); *but see Silva*, 203 F. Supp. 3d at 1166 (ALJ's failure to account for claimant's moderately limited ability to adapt to changes in the workplace was harmful error where "the unskilled jobs cited by the VE and the ALJ require the ability to deal with changes in a routine work setting on a sustained basis").

However, there is no indication that the ALJ made any attempt to account for Mr. Sherman's at least moderately limited ability to accept instructions and respond appropriately to criticism from supervisors in his RFC. As previously noted, "an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity." *Smith*, 821 F.3d at 1269. However, "a moderate impairment is not the same as no impairment at all," *Haga*, 482 F.3d at 1208; and, the "ability to interact with supervisors is a work-related mental ability that is critical to all work, and the ALJ must adequately address it in the RFC." *Bennett v. Berryhill*, No. 1:16-CV-00399-LF, 2017 WL 5612154, at *7 (D.N.M. Nov. 21, 2017). Thus, it was error for the ALJ to simply ignore the uncontroverted medical source opinions on this point.

---

[40] Substantial evidence does not support the ALJ's determination at step three that Mr. Sherman was only mildly limited in his ability to adapt to changes in routine. (*See* AR 544.) In support of this determination, the ALJ cited to Dr. Simutis' opinion. (*Id.*; *see* AR 651-53.) However, the ALJ gave Dr. Simutis' opinion "little weight," (AR 554), and gave greater weight to the opinions of Drs. Rexroad, Hughson, Rankin, and Simon, all of whom found that Mr. Sherman's ability to adapt to changes in the workplace was moderately limited. (AR 86-88, 432, 468-69, 477-78, 940-41.) The ALJ also noted Mr. Sherman's own reports that he does not handle stress well and requires "a while" to adapt to change. (AR 264, 299, 544, 784.) Thus, the record evidence that Mr. Sherman is moderately limited in his ability to adapt to change overwhelms the evidence that he is only mildly limited in this domain. *Langley*, 373 F.3d at 1118.

Rather, she should have either accounted for Mr. Sherman's impaired ability to interact with supervisors in formulating his RFC, or explained why she rejected this limitation "while appearing to adopt the other[]" functional limitations Drs. Rexroad, Hughson, Rankin, and Simon found.[41] *Haga*, 482 F.3d at 1208.

The Commissioner argues that the ALJ did not need to account for Mr. Sherman's impaired ability to interact with supervisors because Drs. Rankin and Simon included this limitation in the part of the MRFCA form formerly known as Section I, rather than the part formerly known as Section III. (Doc. 19 at 12-13.) However,

> the POMS distinguishes between Section I and Section III expressly in order to assist the doctor (who is acting as an adjudicator) in making an ultimate determination of disability, rather than to dictate (or even suggest) how the ALJ should weigh the doctor's MRFCA form (i.e., his nonexamining opinion) at a later administrative stage. The regulations, the POMS, and the case law explicitly and repeatedly require ALJs to consider *all* of the findings made by nonexamining physicians and do not except the Section I findings.

*Silva*, 203 F. Supp. 3d at 1164 (emphasis in original).  Thus, this Court "cannot agree with the Commissioner that the ALJ in this case was permitted to ignore [the] Section I findings [of Drs. Rankin and Simon] merely because they were recorded in Section I."  *Id.*

Nor was the ALJ's error harmless.  (Doc. 19 at 13.)  The Commissioner points out that the three jobs on which the ALJ relied at step five require the lowest level of interaction with supervisors of the jobs included in the *Dictionary of Occupational Titles*.[42]  (*Id.*)  However, as

---

[41] Though the Court cannot be sure without an express explanation from the ALJ, it does not appear that the ALJ intended to reject this functional limitation.  At step three, the ALJ found that Mr. Sherman is moderately limited in "interacting with others," and she affirmed at step four that her RFC "reflect[ed] the degree of limitation [she] found" at step three.  (AR 543-44.)

[42] The Commissioner explained that the jobs on which the ALJ relied at step five had a "specific vocational preparation [SVP] of two," which "corresponds with unskilled work."  (Doc. 19 at 14 & n.5.)  The Commissioner further explained that these jobs had a "People rating of 8," (*id.*), which "ranking describes the need to take instructions as only attending to the work assignment instructions or orders of supervisor[s] with no immediate response required unless clarification of instructions or orders is needed."  *Lane v. Colvin*, 643 F. App'x 766, 770 n.1 (10th Cir. 2016) (quotation marks and brackets omitted).

previously noted, the "ability to interact with supervisors is a work-related mental ability that is critical to all work," including unskilled work requiring a comparatively low level of interaction with supervisors. *Bennett*, 2017 WL 5612154 at *7. Further, at the August 2014 hearing in this matter, the VE testified that Mr. Sherman would be unable to do certain unskilled jobs requiring a comparatively low level of interaction with supervisors if he was moderately restricted, *inter alia*, in his ability to interact with supervisors.[43] (AR 63-64.) Thus, had the ALJ properly considered the uncontroverted medical source opinions in the record regarding Mr. Sherman's impaired ability to interact with supervisors and accounted for this limitation in formulating his RFC, it may have reduced or eliminated the type and number of jobs she found Mr. Sherman could perform at step five. That the ALJ picked and chose through the functional limitations in the medical source opinions of record therefore requires remand. *Haga*, 482 F.3d at 1208.

## C. The Court recommends that the Commissioner assign this case to a different ALJ on remand.

Finally, the Court must consider Mr. Sherman's request that the Court remand this matter for rehearing before a different ALJ. (Doc. 18 at 26.) In an unpublished decision, the Tenth Circuit stated that it will direct assignment of a social security case to a different ALJ on remand "only in the most unusual and exceptional circumstances." *Miranda v. Barnhart*, 205 F. App'x 638, 644 (10th Cir. 2005) (quotation marks omitted). Moreover, the Seventh Circuit has stated that courts "have no general power . . . to order that a case decided by an administrative agency be sent back . . . to a different [ALJ]," in the absence of sufficient evidence of bias to require review by a different ALJ as a matter of due process. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Nevertheless, a number of courts have either directed or recommended reassignment of social

---

[43] These jobs, like the jobs on which the ALJ relied at step five, had an SVP of two and a People rating of eight. (AR 63.)

security cases on remand for various reasons other than bias, including that the ALJ "mischaracterized the record," "failed to consider the record with adequate care," or "failed to adequately consider the medical evidence." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004) (collecting cases); *see also Guthrie v. Barnhart*, No. CV 03-1399 KBM, 2004 WL 7337620, at *5 (D.N.M. Aug. 12, 2004) (recommending "that the Commissioner consider assigning this matter to a different ALJ upon remand to take a fresh look at the matter").

Here, Mr. Sherman has not alleged, and the Court does not find, sufficient evidence of bias to require review by a different ALJ as a matter of due process. However, the Court does find that the ALJ's March 2018 decision failed to consider the medical evidence with adequate care, notwithstanding this Court's prior reversal of her October 2014 decision for similar reasons. Consequently, and in light of the many years during which Mr. Sherman's social security claims have now been pending, the Court concludes that, "rather than have the same ALJ review the claims a third time, a fresh look by another ALJ would be beneficial." *Sutherland*, 322 F. Supp. 2d at 292. Thus, the Court recommends that the Commissioner assign this case to a different ALJ on remand, though the Court does not require the Commissioner to do so.

### IV.  Conclusion

For the reasons stated above, IT IS HEREBY ORDERED that Mr. Sherman's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 18) is GRANTED.

IT IS FURTHER RECOMMENDED that the Commissioner assign this case to a different ALJ on remand.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent